**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | **Case No. 1:21-cr-39** |
| ) | |
| **PATRICIA BERHTOLD and** ) | |
| **AUSTIN JOHN DUDENHOEFER,** ) | |
| ) | |
| **Defendants.** ) | |

<u>**MEMORANDUM OPINION**</u>

**Susan Paradise Baxter, United States District Judge**

Pending before the Court in this criminal action is Defendant Patricia Berchtold's Motion

to Compel Production of *Brady* Material, ECF No. 758, which is joined in by Defendant Austin

John Dudenhoefer, ECF No. 775.  For the reasons that follow, the Defendants' motions will be

granted in limited part and otherwise denied.

## I.    BACKGROUND

In November of 2021, a grand jury returned an indictment against Hertel & Brown

Physical and Aquatic Therapy ("H&B") and twenty individuals affiliated with H&B, including

Patricia Berchtold ("Berchtold") and Austin John Dudenhoefer ("Dudenhoefer").  The

indictment charged all Defendants with health care fraud and conspiracy to commit wire and

health care fraud.  ECF No. 1.

On May 10, 2022, a superseding indictment was returned, charging the same Defendants

with the same crimes, but with some amended averments.  ECF No. 425.  In essence, the

Government alleges that, between January 2007 and October 2021, the Defendants participated

in a scheme whereby false or inflated billing statements were submitted to various public and

private health care insurers in order to obtain payment for services that were not authorized or were not actually rendered to H&B's patients in the manner described.  According to the Superseding Indictment, the conspiracy resulted in losses of at least $22 million to the insurance entities that were allegedly defrauded.

Berchtold and Dudenhoefer are among the individuals named in the Superseding Indictment.  The Government claims that, during times relevant to the alleged conspiracy, Berchtold worked as a billing specialist for H&B (typically from a remote location in Florida) and, in that capacity, participated in the alleged offenses.  Dudenhoefer is alleged to have participated in the offenses while employed by H&B as a licensed physical therapist.

In January 2022, following this Court's entry of a protective order, the Government began its production of discovery materials, which has occurred on a rolling basis. Among other things, the prosecution has turned over: (i) the search warrants and affidavits relating to the underlying investigation, (ii) records obtained from Medicaid, Medicare, and various private health insurance companies, (iii) evidence seized from H&B's five facilities pursuant to search warrant(s), (iv) consensual videos recorded at the Peach Street H&B facility, (v) an external hard drive containing imaging of the computers at H&B's facilities; (vi) a USB-C flash drive containing emails of certain H&B employees, (vii) H&B YouTube videos, (viii) H&B website information, (ix) Highmark and Medicare claims comparison data, (x) and WebPT records from H&B's Peach Street facility for the period February 23, 2021 to October 6, 2021.  Certain statements which the Government intends to introduce at trial have been provided to all defense counsel. Each individual Defendant who was interviewed by law enforcement and/or by a professional conduct investigator received a copy of the interview report(s) and any existing rough notes pertaining to his or her interview.  Other individualized disclosures have included

college transcripts, continuing education records, criminal histories, bank and tax records, personal email account records, and credit bureau reports.

Particularly relevant for present purposes are certain disclosures that the Government made to the defense pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963).  On three occasions in February 2022, April 2022, and March 2023, AUSA Christian Trabold sent letters to defense counsel setting forth information received from various witnesses that the prosecution considered to be potential *Brady* material.  The disclosures typically involved, for each witness, no more than a few sentences describing the favorable information that the witness provided.

Berchtold filed the instant motion on the premise that the Government's *Brady* disclosures are insufficient, particularly as they relate to her role in the alleged conspiracy.  To that end, Berchtold seeks evidence falling into the following categories:

- Documents evidencing statements by witnesses who were interviewed about billing and gave non-incriminatory responses regarding her and the billing department and/or indicated they did not interact with or receive direction from Berchtold or the billing department;

- The statement of Lindsey Whitney as it applies to Berchtold and/or the billing department; and

- Complete statements/reports, or at least more wholesome documentation, from which the snippets of information provided by the Government in its *Brady* disclosure letters to date have been culled so that the full context of the admittedly exculpatory evidence can be understood and evaluated for use in Ms. Berchtold's defense.

ECF No. 758 at 4.

Dudenhoefer has joined in Berchtold's motion for additional *Brady* disclosures.  ECF No. 775.  Like Berchtold, Dudenhoefer requests more complete documentation relating to the Government's Brady disclosure letters.  In addition, he seeks to obtain any non-incriminating statements that may have been made by witnesses who were questioned about his involvement in

3

providing and documenting physical therapy services.  *Id*. at 2.  Relatedly, Dudenhoefer requests additional exculpatory or non-incriminating evidence that tends to disprove his alleged involvement in altering patient appointment schedules and/or allowing unlicensed technicians to use his WebPT credentials in furtherance of the alleged scheme. ECF No. 841.

The Government has responded to Berchtold's and Dudenhoefer's requests, ECF No. 770, and 781, and Berchtold has filed a reply brief.  ECF No. 778.  The Court heard argument on November 28, 2023.  Dudenhoefer has filed a supplemental, post-argument brief in support of his position on *Brady* disclosures, *see* ECF No. 841, and Berchtold recently filed supplemental authority in support of her *Brady* argument. *See* ECF No. 850.  The Court's analysis and ruling follows.

## II.       GOVERNING LEGAL PRINCIPLES

The United States Court of Appeals for the Third Circuit has recognized that discovery in criminal cases is limited to those areas delineated in Rule 16, "with some additional material being discoverable in accordance with statutory pronouncements and the due process clause of the Constitution." *United States v. Ramos*, 27 F.3d 65, 67-68 (3d Cir. 1994).  As a general matter these other areas are limited to the Jencks Act[1] and materials available pursuant to the "*Brady* doctrine." *Id*. at 68.

Under *Brady v. Maryland*, *supra*, a prosecutor has an obligation to disclose evidence that is "favorable" to an accused individual so long as it is "material either to guilt or to punishment." 373 U.S. at 87.  "Evidence is 'material' only if there is a reasonable probability that its disclosure

---

[1] *See* 18 U.S.C. §3500.

would have led to a different outcome at trial, and so undermines confidence in the verdict."
*United States v. Lacerda*, 958 F.3d 196, 218-19 (3d Cir. 2020) (citing *Turner v. United States,*
582 U.S. 313, 324 (2017)).  The *Brady* doctrine extends to "evidence that goes to the credibility
of crucial prosecution witnesses." *Buehl v. Vaughn*, 166 F.3d 163, 181 (3d Cir.1999) (citing
*Giglio v. United States*, 405 U.S. 150, 154 (1972)).  "Referred to as *Giglio* material, this
evidence is a subset of *Brady* material insofar as it addresses situations in which certain evidence
about a witness's credibility or motivation to testify exists, and where 'the reliability of a given
witness may well be determinative of guilt or innocence.'" *United States v. Maury*, 695 F.3d 227,
249 (3d Cir. 2012) (quoting *Giglio*, 405 U.S. at 154).  Failure to disclose either type of material
violates the defendant's due-process rights.  *United States v. Coles*, 511 F. Supp. 3d 566, 576.
And even inadmissible evidence may be material "if it could ... [lead] to the discovery of
admissible evidence." *Johnson v. Folino*, 705 F.3d 117, 129-30 (3d Cir. 2013) (collecting cases).

### III.    DISCUSSION

#### A.   *Defendants' Request for Negative Exculpatory Information*

Both Berchtold and Dudenhoefer ask that, consistent with *Brady*, the Government be
directed to produce certain types of non-incriminatory information.  Berchtold seeks the
statements of individuals who were asked billing-related questions but did not implicate her in
any wrongdoing.  She contends that such information is exculpatory even if the witness did not
expressly exculpate her by name.  ECF No. 758 at 7.  Dudenhoefer requests the statements of
individuals who gave non-incriminating responses about the physical therapy services he
provided and/or his involvement in entering information into H&B's electronic medical record or
other software platforms.  In his post-hearing brief, Dudenhoefer requests additional non-

incriminating information which would contradict the Government's allegations that he altered patient appointment schedules and/or allowed unlicensed technicians to use his credentials in furtherance of the alleged scheme to commit health care insurance fraud.

The Government maintains that the Defendants' requests exceed its *Brady* obligations. To that end, the Government represents that it searched all witness statements for any reference of Berchtold's name and that it has already produced all relevant *Brady* information of which it is aware. The Government contends that the additional requests made by Berchtold and Dudenhoefer involve, at most, neutral information not within the scope of required disclosures.

The parties' dispute implicates the distinction between "negative exculpatory" information and "neutral" information. Courts in this circuit and elsewhere have recognized that, in certain contexts, the absence of incriminating information can constitute exculpatory evidence that is subject to disclosure under *Brady*.

In *Simmons v. Beard*, for example, the U.S. Court of Appeals observed that "negative" or "inconclusive" forensic testing results "may be exculpatory even where they do not provide definitive evidence on a particular issue." 590 F.3d 223, 237 (3d Cir. 2009). In *Simmons*, the court held that inconclusive lab reports were *Brady* material because they failed to link the defendant to an alleged sexual assault of the prosecution's principal witness, and that information could have been used by the defense to substantially undermine the witness's credibility concerning the assault and other aspects of her testimony that linked the defendant to an alleged murder.

Similarly, "[s]tatements by a knowledgeable witness that do not implicate a defendant may sometimes qualify as 'negative' exculpatory evidence that must be produced under *Brady*." *United States v. Nagle*, Crim. No. 1:09-cr-384-01, 2013 WL 3894841, at *57 (M.D. Pa. July 26,

6

2013); *see also United States v. Salerno,* Crim. No. 3:10-cr-301, 2011 WL 6141017, *9 (M.D. Pa. Dec. 9, 2011) (same).  Such was the case in *Jones v. Jago*, 575 F.2d 1164 (6th Cir. 1978), wherein the prosecution was found to have violated the due process rights of petitioner Harllel Jones by withholding the statement of a non-testifying material witness in Jones' criminal proceeding.  Jones was the leader of a criminal organization who was convicted in a murder and shooting trial based on the theory that he had organized a meeting of his members and directed them to engage in a retaliatory shooting of security guards and police officers.  At Jones' trial, the prosecution presented testimony establishing that, during the alleged meeting, Jones had personally given a shotgun to one Victor Harvey, who subsequently participated in the shooting. The defense countered with evidence that Jones was not involved in any aspect of the shooting and that another gang member, Marvin Bobo, had given Harvey the shotgun from the trunk of his car.  Prior to the trial, Harvey had given law enforcement agents a detailed account of his participation in the shooting, which made no mention of an organizational meeting or of Jones' involvement in planning the shooting.  Harvey also had made no mention of obtaining the shotgun from Jones and instead commented that he noticed a shotgun in the trunk of Bobo's car. When agents asked at the conclusion of Harvey's statement if there was "anything else you can tell us about this murder," Harvey had replied "No."  575 F.2d at 1166.

On appeal from the district court's grant of habeas corpus relief, the Sixth Circuit Court of Appeals affirmed and concluded that Harvey's statement should have been produced as *Brady* material, as it was "vital to the defense's decision" whether to call Harvey as a trial witness. 575 F.2d 1167.  The court noted that "[t]he statement of an eyewitness to a crime which makes no reference even to the presence of the defendant or his participation must be viewed as a potentially powerful exculpation."  *Id*. at 1168.  Importantly, "Harvey was in a position to have

knowledge concerning the involvement or non-involvement of Jones, and of course whether Jones had furnished him the shotgun." *Id*. at 1167.  The court concluded that Jones had a "substantial basis" for viewing Harvey's non-incriminating statement as exculpatory and material evidence:

> If Harvey obtained the shotgun from Marvin Bobo's trunk, there is at least a strong inference that he did not get it from Harllel Jones. If, as his statement indicated, he could tell the government agents nothing more about the murder than he had already revealed, there is at least a reasonable inference that Jones did not participate in the discussion with the other members leading to the shootings.

*Id*. at 1168.

Similarly, in *United States v. Mansker*, 240 F. Supp. 2d 902 (N.D. Iowa 2003), the trial court determined that the prosecution had violated its *Brady* obligations in a drug trafficking case by failing to turn over the debriefing reports of certain cooperating witnesses.  The pretrial interview notes of these witnesses revealed that, when identifying their sources and customers, they had made no mention of the defendant.  The court found these omissions "particularly exculpatory under the circumstances of this case in which the defense's theory was that the witnesses fabricated [incriminating] testimony after being sentenced in the hopes of receiving a Rule 35 motion."  240 F. Supp. 2d at 912.  "Under this set of facts," the court found that "the defendant [was] entitled to know that he was not named earlier because that was *the core issue* in [the] case."  *Id*. (emphasis added).  *Cf. Nagle*, 2013 WL 3894841, at *56-57 (FBI 302 report of prosecution witness's pretrial interview was not favorable material for purposes of *Brady,* despite its non-incriminating nature, where there was no showing that the witness "was a knowledgeable witness who 'would have and should have known' of [the defendant's] role in the conspiracy").

At the same time, *Brady* does not require the disclosure of non-incriminating evidence that is irrelevant or neutral, rather than exculpatory.  *See United States v. Ringwalt*, 213 F. Supp. 2d 499, 518 (E.D. Pa. 2002) ("*Brady* does not apply to neutral evidence."); *United States v. Pone*, Crim. No. 93-40-07, 1994 WL 369870, at *5 n.8 (E.D. Pa. July 15, 1994) ("Brady has never been interpreted to require the disclosure of neutral, irrelevant or inculpatory evidence."); *United States v. MacFarlane*, 759 F. Supp. 1163, 1168 (W.D. Pa. 1991) (same); *accord United States v. Dillman,* 15 F.3d 384, 390 (5th Cir. 1994) (grand jury testimony from witness who could not recall or remember alleged meeting was not *Brady* material, since it was "neutral, not exculpatory or impeaching in nature"); *United States v. Bryan*, 868 F.2d 1032, 1037 (9th Cir. 1989) (rejecting the argument "that any information gleaned from any witness by a federal prosecutor that does not incriminate the defendant necessarily exculpates him," since that proposition was "supported by neither law nor logic"); *McGill v. United States*, No. 1:14-CR-167-WSD-LTW, 2018 WL 4523154, at *10 (N.D. Ga. Mar. 20, 2018) (court concluding that the absence of additional incriminating evidence on defendant's electronic devices was not exculpatory where defendant was charged only with one count of attempting to entice a minor to engage in unlawful sexual activity), *report and recommendation adopted*, 2018 WL 4002055 (N.D. Ga. Aug. 21, 2018).

Here, the parties disagree whether the Defendants' requests involve exculpatory, or merely neutral, information.  The Court has previously discussed the difficulties involved in establishing abstract, categorical parameters around the prosecution's *Brady* obligations.  *See* ECF No. 830.  The analysis becomes even more challenging when the sought-after evidence is otherwise facially non-incriminating.

As a general proposition, the Court agrees with Defendants that evidence is favorable to the defense if it directly contradicts the Government's theory of the case, or if it undermines an essential element of the alleged crime (such as intent), or if it points to the defendant's non-involvement in the alleged unlawful activity. *See, e.g, Smith v. Holtz*, 30 F. Supp. 2d 468, 477 (M.D. Pa. 1998) ("If the evidence favors the defendant in criminal proceedings, as by directly supporting the defendant's non-involvement or by supporting a theory of the case inconsistent with the prosecution's, it is exculpatory."). We must therefore consider the allegations in the Superseding Indictment as well as Berchtold's likely defenses.

Here, the Government has alleged that Berchtold knowingly submitted (or directed others to submit) billing claims for treatment services provided by unlicensed technicians, which were fraudulently documented in the electronic medical records system using the credentials of licensed employees. It is further alleged that Berchtold billed "time spent with patients that was in excess of the actual time spent," that she knew billing claims were submitted under the credentials of providers who were not at work at the time, that she falsified billing claims "by not accurately listing the physical therapist or physical therapy assistant that actually provided treatment to the patient," and that she billed for CPT codes that did not correspond with the treatment provided. *See* ECF No. 425, ¶¶43, 44, 49, 50, 52, 57, 59. Berchtold denies these allegations and has proffered an alternative theory in her own defense, *to wit*:

> from her home office in Florida, [she] was responsible for overseeing Hertel & Brown's submission of bills to insurance companies and government payors and interacting with patients and insurance companies regarding insurance and billing-related issues. However, she did not even view, let alone supervise, the treatment of patients; nor did she control the information inputted by care providers into Hertel & Brown's electronic medical record (EMR) system (WebPT since 2013), some of which information was then automatically transferred into a separate electronic billing system (Kareo) to be used for billings; nor did she have personal knowledge about who inputted the information into the EMR.

10

ECF 758 at 2.

These allegations and counter-allegations should guide the prosecution's *Brady* analysis. Thus, if a technician, physical therapist ("PT") or physical therapist assistant ("PTA") was interviewed and indicated that they were never directed by Berchtold or anyone in the billing department to falsify information, that would plainly be exculpatory information subject to disclosure. The Government does not dispute that point and has represented that such information would have been turned over already. On the other hand, if a witness was asked about billing procedures and merely identified Berchtold as the person who handled the billing at H&B, without further comment, that statement would not be considered exculpatory.

The disagreement here mostly involves statements falling between these two extremes. For example, the Government posits that *Brady* is not implicated if a witness did not mention Berchtold during an interview or if the witness merely indicated that he or she had no contact with Berchtold. The defense insists that any statement by a PT or PTA indicating that they never talked to Berchtold is plainly exculpatory in light of the Government's theory that Berchtold directed these employees regarding treatment documentation and billing matters. In Berchtold's view, PTs and PTAs (along with billing employees) are the sort of "knowledgeable witnesses" whose non-incriminatory statements vis-a-vis billing matters constitute *Brady* material.

As the Court intimated at oral argument, any determination as to what constitutes negative exculpatory information is inherently a fact-specific exercise. In *Jones*, for example, the shooter Victor Harvey was plainly a "knowledgeable witness," as he was uniquely positioned to know whether or not Jones had organized the shooting and had supplied him with a shotgun. Therefore, Harvey's statement omitting any reference to Jones's involvement was "potentially powerful exculpation." 575 F.2d at 1168. In this case, treating every PT and PTA as a

11

"knowledgeable witness" may be casting the *Brady* net too far, given that Berchtold is not alleged to have interacted with every H&B employee who provided and/or documented patient services.  Nor can the Court say as a blanket matter that *Brady* encompasses every billing-related discussion wherein a witness did not reference Berchtold.  Still, the Court recognizes that a central dispute in this case concerns Berchtold's alleged awareness that inaccurate treatment information was being entered into the WebPT system and utilized for billing purposes.  Therefore, if a PT or PTA stated, or plainly suggested, that no one in the billing department instructed them how to document treatment services or told them what billing codes to use, that information would be favorable to Berchtold and should be produced.  Similarly, a witness statement is likely discoverable if it plainly suggests that employees in the billing department (including Berchtold) were generally *not involved in*, or *lacked knowledge about*, the alleged fraudulent documentation of treatment services in the WebPT system.  But again, context matters. Whether a piece of evidence is favorable to the defense depends on whether it logically supports an exculpatory inference and how strong that exculpatory inference is vis-a-vis other possible conclusions.  *Cf. Turner v. United States*, 582 U.S. 313, 326 (2017) (Evidence is not material if it is "too little, too weak, or too distant from the main evidentiary points to meet *Brady's* standards.").

The Court next consider Dudenhoefer's request for additional *Brady* material, which focuses on slightly different issues.  His first request pertains to the Government's allegation that Dudenhoefer and others altered patient appointment schedules for the purpose of concealing the treatment of Medicare patients by unlicensed technicians and/or for concealing that Medicare patients were not receiving one-on-one treatment from a licensed PT.  ECF No. 425, ¶60.  As part of its *Brady* disclosures, the Government has revealed statements by three different PTAs

who variously indicated they were "not aware of schedule moves at the Fairview or Harborcreek locations," were "never asked to move patients on the schedule as a tech" or were "unaware of Medicare patients being moved on the schedule." *See* ECF No. 841 at 2.  Dudenhoefer seeks more details concerning these statements, but also wants the Government to disclose whether other employees were asked similar questions and gave similar answers that would reflect favorably on Dudenhoefer's conduct at the Summit or West Erie Plaza offices.  In response to this request, the Government assured the Court that it has viewed its *Brady* obligation through the lens of its own allegations, that it has reviewed the entirety of all witness statements, and that it has produced information, such as the aforementioned disclosures, which could arguably be deemed exculpatory.  Dudenhoefer's suggestion that there may be other similar statements out there that the Government has not yet shared is both speculative and belied by the express representations of AUSA Trabold.  Accordingly, this aspect of his motion will be denied.

Dudenhoefer's second request pertains to the Government's allegation that he and others "instructed, directed and permitted" unlicensed technicians to utilize their WebPT credentials for the purpose of concealing the fact that the unlicensed technicians, rather than licensed employees, were providing treatment services.  ECF No. 425, ¶¶46-48.  When interviewed by law enforcement agents on this point, Dudenhoefer claimed that unlicensed employees utilized the WebPT credentials of licensed employees in order to perform purely administrative functions, such as accessing the daily treatment schedule, documenting a patient's arrival time, or obtaining "flow sheets."  Dudenhoefer now requests the production of any witness statement involving similar assertions, which he views as negative exculpatory information.  Assuming such evidence exists, the Court again notes that the potential exculpatory value of the statements would be entirely context driven.  As noted, the Government has alleged that unlicensed

13

technicians utilized WebPT as a mechanism to disguise their involvement in treating patients; therefore, evidence which suggests they utilized WebPT solely for reasons unrelated to treatment and billing would seemingly contradict the Government's theory of the case and arguably constitute exculpatory information.  Similarly, if a witness was unaware of unlicensed technicians ever accessing WebPT at all, that might also constitute negative exculpatory evidence if the witness was in a position to know of those types of office practices.  But whether a statement constitutes discoverable *Brady* material depends on, among other things, how knowledgeable the witness is and how directly their statement contradicts the Government's theory of the crime.

Ultimately, the Government must make these assessments in the first instance.  *See Pennsylvania v. Ritchie*, 480 U.S. 39, 59 (1987) (noting that, in a typical case, "it is the State that decides which information must be disclosed" under *Brady*); *Ramos,* 27 F.3d at 71 (noting it is "unwise" to infer the existence of *Brady* material based on speculation alone).  In doing so, the prosecution must "make judgment calls about what would count as favorable evidence" because "the very fact that the character of a piece of evidence as favorable will often turn on the context of the existing or potential evidentiary record."  *Kyles v. Whitley,* 514 U.S. 419, 439 (1995).  As always, the Court encourages the Government to err in close cases on the side of disclosure, as this will help to forestall any possible due process concerns and help ensure the fair administration of justice.  *See Kyles,* 514 U.S. at 439 (noting that "a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence[,] and "[t]his is as it should be"); *Agurs,* 427 U.S. at 108 ("[T]he prudent prosecutor will resolve doubtful questions in

favor of disclosure."); *Coles*, 511 F. Supp. 3d at 576 (citing *Kyles* and noting that "the United States Supreme Court favors a liberal policy of disclosure of exculpatory material").[2]

Here, the Government has consistently acknowledged its *Brady* obligations and, to that end, it has produced to the defense a considerable amount of favorable evidence on an ongoing basis, and in a timely fashion.  Nevertheless, to the extent the Government's responses to any Defendants' *Brady* requests in this case are not in compliance with the standards discussed herein, it shall promptly supplement its disclosures.

### B.  Defendant Berchtold's Request for the Statements of Lindsey Whitney

Berchtold also moves for the compelled production of information provided by Lindsey Whitney, a former H&B employee who worked in the billing department and received training and instruction from Berchtold.  Because she worked closely with Whitney, Berchtold surmises that Whitney was likely questioned about H&B's billing policies and Berchtold's specific role in the alleged conspiracy.  Berchtold notes that her counsel has interviewed Whitney and based on

---

[2] In her most recent supplemental filing, Berchtold directs the Court to *United States v. Cloud*, No. 22-30044, 2024 WL 2281665, -- F. 4th -- (9th Cir. 2024), which, she believes, sets forth "the appropriate" standard for evaluating pre-trial *Brady* motions. *See* ECF No. 850.  In *Cloud*, the Ninth Circuit approvingly cited cases that have dispensed with the "materiality" inquiry for purposes of deciding pretrial *Brady* motions, requiring instead that any information "favorable" to the defense be produced.  *See id.* at *8-9.  Not all courts have adopted this standard. *See, e.g., Boyd v. United States*, 908 A.2d 39, 61 (D.C. 2006); *United States v. Causey*, 356 F. Supp. 2d 681, 696 (S.D. Tex. 2005).  The Court's research has failed to turn up any case in this judicial circuit where the standard discussed in *Cloud* has been adopted (and the defense has not cited any).  But in any event, this Court is of the view that the concern discussed in *Cloud* -- *i.e.,* the inherent difficulty in judging the materiality of exculpatory evidence prior to trial -- is adequately addressed by careful adherence to the Supreme Court's admonition that prosecutors should err on the side of disclosure in close cases.  *See United States v. Agurs*, 427 U.S. 97, 108 (1976) ("Because we are dealing with an inevitably imprecise standard, and because the significance of an item of evidence can seldom be predicted accurately until the entire record is complete, the prudent prosecutor will resolve doubtful questions in favor of disclosure.").  To date, the Government's disclosure letters suggest that it is complying with this standard.

that interview, she believes it likely that Whitney's statement to the Government involves exculpatory information.  Berchtold also asserts that Whitney engaged in a series of email exchanges with a Government agent in this case, none of which obviously implicated Berchtold in the alleged misconduct and some of which the defense views as "clearly exculpatory." ECF No. 758 at 9; *see* ECF No. 758-4.  Berchtold therefore asks that the Court compel the production of Whitney's statement or, alternatively, review the statement *in camera* to ensure that the Government has fulfilled its *Brady* obligations.

The Government's response is two-fold.  First, it notes Berchtold's representation that her counsel has already spoken to Ms. Whitney.  To the extent the defense obtained favorable information from that exchange, the Government insists it is not obliged to produce information that is already in the Defendant's possession.

Second, the Government contends that it does not regard any statements given by Ms. Whitney to the prosecution team as *Brady* material.  Instead, it regards her statements regarding Berchtold to be neutral, at best. Despite this, the Government represented in its brief that it would be "more than willing to submit the reports of Ms. Whitney's statements to investigators to the Court for an *in camera* review to determine whether they should be produced to the defense under *Brady*."  ECF No. 770 at 11.  At oral argument, the Government reiterated its willingness to submit Ms. Whitney's statement for an *in camera* review but argued that doing so would establish an inappropriate precedent, based on this record.  The Government's main argument here is that it has no exculpatory information to produce, and the Court should not assume, merely because Ms. Whitney gave the defense favorable information, that she must have shared that same information with the Government.

In her reply, Berchtold argues that she does not have the specific information sought in her motion -- namely, the statements Ms. Whitney made to the Government, particularly her responses to any "billing questions" posed by agents.  And Berchtold disputes that the information she seeks is neutral. "Given their overlapping roles and the fact that Ms. Whitney was trained by Ms. Berchtold, Ms. Whitney certainly 'would have and should have known' of any alleged criminal conduct by Ms. Berchtold.  778 at 7 (citing *Nagle*, 2013 WL 3894841, at *57 and other authority).  Thus, Berchtold insists that any non-inculpatory statement by Ms. Whitney constitute *Brady* material under the "negative exculpatory evidence" line of cases.

Based on Berchtold's representations that she worked closely with Ms. Whitney, albeit from different physical locations, the Court assumes that Ms. Whitney was in a position to know whether Berchtold engaged in inappropriate billing practices.  Therefore, if Ms. Whitney was questioned about H&B's billing practices and gave non-incriminating answers, that information might be discoverable *Brady* material. As mentioned previously, the context of her statements is important.  If, for example, Ms. Whitney denied having specific knowledge about Berchtold's personal work habits and billing practices, that would not be exculpatory information.  If, on the other hand, Ms. Whitney denied any awareness of misconduct on Berchtold's part, that could be considered exculpatory information, particularly if Ms. Whitney confirmed a close working relationship with Berchtold.  Similarly, if she described the company's billing practices in a manner that contradicts the Government's theory, or denied any knowledge of misconduct among billing employees as a group, that could be considered exculpatory *Brady* information.

In light of the Court's discussion herein, the Court will direct the Government to revisit Ms. Whitney's statement and produce it to Berchtold's counsel in the next fourteen days, if it appears to contain either affirmative or negative exculpatory information.  In the alternative, if

17

the Government so chooses, it may produce the statement to the Court for an *in camera* review.

If the Government opts for the latter course of action, it should also submit a position statement

concerning its view as to why it believes the information may not constitute *Brady* material.

### C.  The Defendants' Request for More Detailed Brady Disclosures

Finally, Defendants ask the Court to require of the Government more detailed *Brady*

disclosures that than which have been produced to date.  Dudenhoefer requests all recordings,

interview memoranda, rough notes of interviews, or grand jury testimony relating to the

statements of witnesses who commented on the alleged altering of patient appointment

schedules.  Berchtold points to alleged deficiencies in the Government's March 29, 2023

disclosure letter.  ECF No. 758-2.  As described by Berchtold, "[t]he March 29 letter contains

only naked snippets, summaries, or paraphrases of the statements of 32 different witnesses."

ECF No. 758 at 9.  Berchtold maintains that these "snippets and summaries" are insufficient for

her to determine "even their basic meaning and impact -- let alone their potential exculpatory

value or how they may fit into building a defense."  *Id.*   By way of example, Berchtold cites the

following disclosures attributed to one particular witness (whom the Court will refer to as

"K.R."):

> [K.R.] stated that when scheduling, only 5 evaluations could be set per day per PT.
> PTAs were not allowed to conduct evaluations.  Patients were not treated differently
> based on their insurance when scheduling.  Berchtold sometimes reminded PTs that
> they could not see a patient forever.  [K.R.] was never told to administer treatment
> on a patient.

ECF 758-2 at 5.  Berchtold maintains that, without additional context, this disclosure fails to

provide meaningful insight into the potential value of the statements, either as exculpatory or as

impeachment information.  Accordingly, Berchtold seeks an order compelling the Government

to produce the full statements or at least the relevant portions thereof which sufficiently provide the full context and meaning to the limited excerpts produced.

The Government counters that it will continue to abide by its disclosure obligations under *Brady*, but it strongly denies that it is under any duty to provide witness statements "in their primary, law enforcement format." ECF 770 at 8. Although there appears to be no binding Third Circuit authority on the matter, the Government has cited cases from other jurisdictions which generally support its position. *See, e.g., United States v. Henderson,* 250 F. App'x 34, 38-39 (5th Cir. 2007) (finding no *Brady* violation where "[a]ll the relevant information" from an email between a DEA agent and AUSA was disclosed by the government in a letter to defense counsel one month prior to trial); *United States v. Grunewald,* 987 F.2d 531, 535 (8th Cir. 1993) (finding no *Brady* violation where the prosecution provided typewritten summaries of IRS agent's notes to the defense, rather than the notes themselves); *United States v. Van Brandy,* 726 F.2d 548 (9th Cir. 1984) (no *Brady* violation arose from the court's failure to compel production of an informant's FBI file, where the prosecution provided summaries of information from the informant's file that was favorable to the defense, the informant was vigorously cross-examined on credibility issues at trial, and the value of any additional non-disclosed information was "marginal"); *United States v. Parnas*, Case No. 19-CR-725, 2021 WL 2981567, at *6 (S.D.N.Y. July 14, 2021) ("The Government represents that it has provided multiple letters disclosing the essential facts that would enable Defendants to call witnesses and take advantage of any exculpatory testimony. Assuming this to be true, the Court concludes that the Government has met its *Brady* obligations."); *United States v. Flynn*, 411 F. Supp. 3d 15, 37 (D.D.C. 2019) (court noting that "persuasive authority holds that the government's production of summaries of notes

and other documents does not constitute a *Brady* violation") (citing *Grunewald* and *Van Brandy, supra*).

Berchtold disputes the applicability of this authority and refers the Court instead to *United States v. Park*, 319 F. Supp. 2d 1177 (D. Guam 2004).  There, the district court compelled the prosecution to produce its notes of interviews with potentially exculpatory witnesses, observing that summaries of the conversations were "not the equivalent of actual notes" for the following reasons:

> First, summaries invariably involve a process of interpretation and characterization. That is the essence of a summary. Different individuals may hear or read the same words and summarize their meaning differently. Second, context, emphasis, and subtle distinctions may not be precisely captured by summaries. For example, it may be significant that a witness repeated an answer multiple times. The general topics being discussed at the time a statement is made may also explain the statement. Third, because the government is not necessarily privy to the defense's strategy, seemingly innocuous or immaterial statements by a witness may not be included in a summary. These seemingly innocuous or immaterial statements may, because of different facts known to the defense, be important for purposes of impeachment."

*Id.* at 1178.  Berchtold argues that the reasoning of *Park* applies here in that the "Government's proffered summaries offer no insight into the meaning or context of witness's statements as applied to [her]."  ECF No. 778 at 10.   She cites *United States v. Rigas*, 779 F. Supp. 2d 408, 413 (M.D. Pa. 2011), as another case where the court required the prosecution to produce notes of a witness interview, even though the defense was already aware of the witness and the facts upon which the witness could testify.

Although the Government has advocated a more limited form of disclosure under *Brady*, the Court finds that its position is generally well-taken and appears to represent the prevailing view.  No authority has been cited from within this judicial circuit that would require the production of primary source material under the facts of this case.  *Rigas*, the only Pennsylvania

20

case cited on the matter, did not involve analogous facts.  In that case, the prosecution had

declined to produce *any* information concerning its interviews of a key witness who likely

possessed exculpatory information. The defendants had tried multiple times to interview the

witness on their own, but because the witness refused to meet with them, "the information in the

notes of his interview [was] entirely unavailable to them."  779 F. Supp. 2d at 414.  That is

unlike the situation here, where the Government has outlined the favorable information it

received from approximately three dozen witnesses.  The other cases cited by Berchtold --

*United States v. Ramos*, 27 F.3d 65 (3d Cir. 1994); *United States v. Vella*, 562 F.2d 275 (3d Cir.

1977) -- stand for the proposition that the Government must preserve interview notes so that they

can be disclosed, if it turns out that they contain *Brady* information.  Those cases do not call for

the routine production of interview notes where the Government's disclosures otherwise satisfy

due process.

    Nor does the reasoning of *Park* apply here.  Unlike Berchtold, the Court finds that the

exculpatory nature of the information contained in the Government's disclosure letters is

generally straightforward and self-evident.  Thus, broadly speaking, it cannot be said that the

disclosures "offer no insight into the meaning or context of witnesses' statements as applied to

Ms. Berchtold."  ECF No. 778 at 10.  One exception was the statement attributed to K.R. that

"Berchtold sometimes reminded PTs that they could not see a patient forever."  But the

significance of this statement was clarified by the Government at oral argument, making that

point moot.

    Further, this is not a situation where the Court need worry about the accuracy of the

prosecution's "summaries."  In fact, the Government's disclosures are not "summaries" at all,

but rather, information taken verbatim from the underlying agent reports of witness interviews.

Thus, even if the Court were to order the production of the actual FBI 302 reports, it is unlikely that Defendants would obtain substantially more than they now have.  Any Jencks matter would necessarily be redacted from the witness interview reports, and the Defendants would essentially be given the same information they now possess.

The Court recognizes that, under the law of this circuit, Defendants have no affirmative obligations to exercise "due diligence" relative to their acquisition of *Brady* information.  *See Dennis v. Sec'y, Pennsylvania Dep't of Corr.*, 834 F.3d 263, 290 (3d Cir. 2016) ("[T]he United States Supreme Court has never recognized an affirmative due diligence duty of defense counsel as part of *Brady*, let alone an exception to the mandate of *Brady* as this would clearly be."); *see also Bracey v. Superintendent Rockview SCI*, 986 F.3d 274, 279 (3d Cir. 2021) (noting that "*Dennis* effected a material change in Circuit law with respect to the reasonable expectations of a *Brady* claimant: While we had previously suggested that defendants had to search for exculpatory evidence themselves, *Dennis* made clear that a defendant can reasonably expect— and is entitled to presume—that the government fulfilled its *Brady* obligations because the prosecution's duty to disclose is absolute and in no way hinges on efforts by the defense."). Therefore, the Court has doubts about whether the Government could satisfy its *Brady* obligation merely by providing the names of potentially favorable witnesses. Therefore, the Court has doubts about whether the Government could satisfy its *Brady* obligation merely by providing the names of favorable witnesses, as some caselaw suggests. *See, e.g., United States v. Abdallah,* 840 F. Supp. 2d 584, 615 (E.D.N.Y. 2012).

Nevertheless, the Court concludes that the Government may fulfill its *Brady* obligations so long as it provides the defense a fair and accurate summary of all relevant exculpatory or impeachment information in its possession.  Provided that threshold is met, the Government may

satisfy its disclosure responsibilities by publishing potentially favorable information in the form it has used to date.

Based on the present record, the Court is satisfied that the Government's disclosure letters comply with the mandates of due process as articulated in *Brady v. Maryland* and its progeny. Accordingly, the Defendants' request for production of complete witness statements will be denied without prejudice. The Court will revisit this issue at a later point in the proceedings, should circumstances so warrant.

## IV.     CONCLUSION

For the reasons set forth herein, the Government is directed to revisit the statement of Lindsay Whitney and, if it appears to contain either affirmative or negative exculpatory information as discussed in the accompanying Memorandum Opinion, the Government shall produce the statement to Berchtold's counsel within the next fourteen days. In the alternative, if the Government so chooses, it may produce the statement to the Court for an *in camera* review as discussed herein.

The Government will also be directed to re-examine its files for any witness statements that may constitute discoverable negative exculpatory information, as discussed in this Memorandum Opinion. To the extent any supplemental disclosures are warranted, the Government will be directed to produce the additional *Brady* information within two weeks.

To the extent Defendants seek production of the witness statements referenced in the Government's prior Brady Disclosures, that request will be denied without prejudice.

An appropriate Order follows.

Susan Paradise Baxter
United States District Judge